UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FROYLAN LOPEZ-GARCIA,

  Plaintiff,

v.

UNITED STATES OF AMERICA,

  Defendant.

               /

Case No. 15-11374

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [23]**

On April 25, 2014, Plaintiff Froylan Lopez-Garcia's ("Garcia") work van was struck from behind by a vehicle driven by a United States Postal Service worker. Garcia was transported by ambulance to the hospital where he was treated for three or four hours before being discharged. The following year, Garcia initiated this action against the United States of America (the "Government") under the Federal Tort Claims Act. Garcia maintains that he is entitled to non-economic damages under the Michigan No-Fault Act because the accident left him seriously impaired.

Currently before the Court is the Government's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. 23). Because Garcia has failed to present any evidence establishing causation–a critical component of the *McCormick* inquiry–the Court must, and does GRANT the Government's motion.

I. **FACTS**

A. **The Accident**

The material facts giving rise to this dispute are not seriously debated. On April 25, 2014, Garcia was driving a 2005 Ford Econoline van bearing the name "H-Town Carpet" to a job site. Garcia's employee, Juan Manuel Flores-Ochoa ("Ochoa"), was seated in the front passenger seat. As the van traveled southbound on Wayne Road, it was struck from behind by Deborah Hunt ("Hunt"), a United States Postal Service letter carrier. Garcia testified that he was at a complete stop waiting for a group of ducks to cross the road when the accident occurred. Hunt, on the other hand, maintains that Garcia abruptly stopped in front of her to avoid the birds. In either case, Hunt was issued a citation from the Westland Police Department for failing to stop in sufficient distance to avoid the wreck. Garcia and Ochoa both testified that they were wearing seatbelts, the van's airbags did not deploy, and they did not lose consciousness at any time. (Ex. 1, Lopez Garcia Dep. Tr., 41:19-23, 44:4-6, 52:3-6); (Ex. 4, Flores-Ochoa Dep. Tr., 24:4-14). The van was operable after the accident and did not require any subsequent repairs. (Ex. 1, 49: 13-23).

At some point, an ambulance arrived and transported Garcia to Oakwood Annapolis Hospital in Wayne, Michigan. (Ex. 6, Oakwood Medical Record, OAH-0001-0005). According to the ER report authored by Dr. Deflin Ventura, Garcia complained of moderate lower back and neck pain and left lower flank and left lower ribcage pain, rating his overall discomfort a 6 out of 10. (*Id.* at OAH-0008). While at the hospital, Garcia underwent a CT scan and multiple x-rays. The x-rays came back normal and the CT scan showed "[d]egenerative changes in the lumbar spine" and a posterior disc bulge at the L4-5. (*Id.* at OAH-0048). Garcia's pain was described as "rapidly improving" shortly after he was

2

administered pain medication. (*Id.* at OAH-0030). Approximately four hours after arriving, he was discharged with two prescriptions to help control the pain. (*Id.* at OAH-0007). The Monday following the Friday accident, April 28, 2014, Garcia returned to work. (Ex. 1, 51:10-17).

**B. Post-Accident Medical History**

On June 12, 2014, around seven weeks after the accident, Garcia sought medical treatment from Dr. Craig Peppler, D.O., at Preferred Rehabilitation. (Ex. 7, Peppler Medial Records, PR-0040). The notes from Dr. Peppler's initial examination indicate that Garcia's chief complaints were lower back pain, intermittent bilateral leg pain, and ringing in his ears. *Id.* After a full physical examination, Dr. Pepper concluded that Garcia suffered from acute low back pain, post traumatic cephalgia improving, and neck pain improved.[1] (*Id.* at PR-0043). Dr. Peppler recommended four to six weeks of physical therapy, ordered an MRI of Garcia's lumbar spine, and prescribed medication for pain management. (*Id.* at PR-0044-45).

Between June 13 and July 30, 2014, Garcia completed 20 physical therapy sessions. (*Id.* at PR 0145-0172). At his first appointment, the physical therapist noted that Garcia "demonstrate[d] pain and restricted AROM in lumbar spine affecting activities of daily living and quality of life." (*Id.* at PR-0175). Garcia returned to Dr. Peppler on August 14, 2015. (*Id.* at PR-0029). At that time, Dr. Peppler's impression remained largely the same, adding only that Garcia's "current diagnosis" included "[l]ate effects of motor vehicle accident." (*Id.* at PR-0029-0030). Dr. Peppler re-authorized Garcia's disability certificate, recommended

---

[1] Dr. Peppler's conclusions appear to be largely–if not exclusively–based on Garcia's subjective complaints.

additional physical therapy, and again requested an MRI of the lumbar spine.[2] (*Id.* at PR-0029-30).

Over the course of the next 12 weeks, Garcia completed an additional 31 physical therapy sessions. (*Id.* at PR-0076-0143). The records from those appointments indicate that Garcia was steadily improving. On October 13, 2014, for example, Garcia "reported that the pain [was] getting better with each therapy session." (*Id.* at PR-0103). Similarly, in Garcia's last month of therapy, he "reported minimal soreness in the lower back" (*Id.* at PR-0083), and the physical therapist noted that he "demonstrate[d] reduc[ed] pain[,] improv[ed] AROM in lumbar spine . . . [and] improv[ed] core muscle strength." (*Id.* at PR-0083, 0088). During that same time period, Garcia underwent an MRI of the lumbar spine at Basha Open MRI. According to the report issued by Dr. Seetha Vakhariya, M.D., the MRI showed no sign of "acute fracture", but did indicate "mild diffuse disc bulge" in three regions of the spine. (Ex. 9, Basha Open MRI Records, BD-002).

On November 13, 2014, Dr. Peppler concluded that Garcia "reached maximum medical improvement with physical therapy", and that the MRI did "not show evidence of disc protrusion; however it did show evidence of facet arthritis." (*Id.* at PR-0024). In light of these findings, Dr. Peppler did not believe Garcia was a candidate for surgery, but that he might benefit from lumbar facet injections. *Id.* Between February and April 2015, Garcia received four sets of trigger point injections for pain. (*Id.* at PR-0010). On April 23, 2015–Garcia's last appointment with Dr. Peppler on record–he reported that his pain was "improving", the injections were providing sustained relief, and he did not require a

---

[2] For reasons unknown, Garcia failed to obtain an MRI after his first appointment with Dr. Peppler.

prescription for pain medication. *Id.*

In late 2014, Garcia was referred to an ear, nose and throat specialist for bilateral tinnitus. (Ex. 8, Downriver ENT Records, DEN-0022). Despite having a history of tinnitus dating back to at least 2009 (Ex. 10, Henry Ford Records, HFH-0072), Garcia indicated that the "ringing in both ears plus dizziness" started after the "van accident on April 25, 2014." (Ex. 8, DEN-0005). Nevertheless, the audiologist concluded that Garcia had normal hearing in low frequencies and mild mixed loss in higher frequencies. (*Id.* at DEN-0007). The treating physician recommended bilateral hearing aids and Xanax. (*Id.* at DEN-0003). It is unknown whether Garcia ever acquired the hearing aids or returned to the specialist's office following the November 14, 2014 appointment.

Garcia's last medical appointment was on April 27, 2015 with Dr. Nilofer Nisar, M.D. of Wayne Neurology. Dr. Nisar recommended a battery of tests to evaluate whether Garcia had any radiculopathic, neuropathic, or cerbral abnormalities related to his neck and back pain. (Ex. 11, Wayne Neurology Records, NN-0004). The record does not reflect whether Garcia ever pursued these tests or any additional treatment related to his alleged injuries after April 27.

In January 2015 and again in January 2016, Garcia underwent an independent medical evaluation ("IME") with Dr. Daniel M. Ryan, M.D. (Ex. 12, Ryan IME Report). Based on a thorough review of all available medical records and two physical examinations, Dr. Ryan concluded that Garcia was fully recovered. *Id.* While noting Garcia's "subjective complaints of lower back pain", Dr. Ryan indicated that "there [were] no objective findings . . . of any injury that would be related to the motor vehicle accident at this time. [Garcia's] hands and arms examination were normal. His lower back examination was normal except for the

subjective tenderness." *Id.* In the end, Garcia agreed with Dr. Ryan's assessment that he was capable of returning to work. Garcia has not offered any expert testimony concerning his injuries, the accident, or Dr. Ryan's report.

### C. Life After the Accident

Garcia returned to work three days after the accident, but testified that he quit after about a month because it "didn't work out." (Ex. 1, 10:3-6). This, according to Garcia, was the last time he worked due to pain from the accident. (*Id.* at 10:7-9). Garcia's former supervisor–Matthew Fleeman–remembers things very differently. Fleeman testified that Garcia took approximately six months off to complete physical therapy and then returned on a part time basis, working a few days every week. (Ex. 5, Fleeman Dep. Tr., 38:20-24). According to Fleeman, Garcia continued working until March 2016; right around the time Fleeman was subpoenaed for a deposition in this case, which the two briefly discussed. (*Id.* at 42).

Fleeman's testimony is corroborated by Garcia's own Facebook posts. Indeed, on February 1, 2015, Garcia wrote a note to his aunt indicating that, "I'm always 100 percent and always running my crew." (Ex. 1, 184:7-23) ("I just wrote that down because I don't talk to her . . . but, yes I did put it down that I was working." Q: "Running your own crew? A: "Yes."). Approximately one year later, Garcia was observed by United States Postal Service investigators carrying work items to and from an apartment building and disposing of boxes that had previously held laminate flooring. (Ex. 13, USPS Investigation, 3, ¶¶ 8-9). With respect to leisure activities, Garcia acknowledged Facebook posts establishing that he (1) visited a water park in Galveston, Texas, (2) rode a train at the Toledo Zoo, (3) rode a four-wheel all terrain vehicle, and (4) went on a six-week cross-country road trip with his

family in the summer of 2015. (Ex. 1, 166-67, 172-73, 177-78, 186-87).

## II. LEGAL STANDARD

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## III. ANALYSIS

Under the Federal Tort Claims Act, liability "is usually determined by referencing state law." *Premo v. United States*, 599 F.3d 540, 545 (6th Cir. 2010) (citation omitted). Here, Garcia seeks non-economic damages under the Michigan No-Fault Act, Mich. Comp. Laws. § 500.3135 *et seq.*[3]

---

[3] Garcia has agreed to voluntarily dismiss his claim for economic damages. (Plf.'s Resp. 14).

Tort liability for non-economic loss under the No-Fault Act is limited to cases in which an injury party "has suffered death, serious impairment of body function, or permanent serious disfigurement" that was "caused by [the] ownership, maintenance, or use of a motor vehicle." § 500.3135(1). A "serious impairment of body function" means "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." § 500.3135(5); *McCormick v. Carrier*, 795 N.W.2d 517, 524 (Mich. 2010). The Michigan Supreme Court has explained that, as a threshold matter:

> [t]he court should determine whether there is a factual dispute regarding the nature and extent of the person's injuries, and, if so, whether the dispute is material to determining whether the serious impairment of body function threshold is met. If there is no factual dispute, or no material factual dispute, then whether the threshold is met is a question of law for the court.

*Id.* at 537 (citation omitted). To demonstrate a "serious impairment of body function", a plaintiff must show: "(1) an objectively manifested impairment (2) of an impairment body function that (3) affects the person's general ability to lead his or her normal life." *Id.* The Government argues that Garcia cannot demonstrate a "serious impairment" under *McCormick* for two reasons: First, there is no medical evidence in the record establishing a causal link between an objective injury and the accident. In addition, the Government maintains that Garcia's injuries, if any, have not diminished his ability to lead a normal life. To the extent that there are questions of fact in this case, the Court finds that they are not material for purposes of determining whether Garcia's injury resulted in a serious impairment of body function. For that reason, the "serious impairment" analysis may appropriately be resolved by way of summary judgment.

Under the first prong of *McCormick*, Garcia must show that the injuries *resulting from*

*the accident* were "evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *Id.* at 527. In other words, Garcia must, at a minimum, demonstrate a causal relationship between his injury and the accident. *See Mehdi v. Gardner*, No. 319630, 2015 WL 1227710, at *2 (Mich. Ct. App. March 17, 2015). In *McCormick*, for example, "the plaintiff established an objectively manifested impairment where he suffered a broken ankle as a result of a vehicle accident, had difficulty walking . . . and had continuing pain and a limited range of ankle motion even 14 months after the injury." *Id.* By contrast, in *Mehdi*, "[a]lthough MRIs and a nerve conduction study performed after the accident revealed medical abnormalities in plaintiff's nerves and a bulging spinal disc, which account[ed] for plaintiff's complaints of continuing pain, plaintiff presented no evidence linking his conditions to the vehicle accident." *Id.* This case is much closer to *Mehdi*.

In attempt to establish causation, Garcia directs the Court's attention to a number of medical records suggesting that he suffered *an* injury. *See* (Plf.'s Resp 6-7). But a general reference, without some facially apparent connection to the underlying trauma–or an expert opinion establishing same–is not enough. This is especially true where, as here, a CT scan of Garcia's lumbar spine immediately following the accident was deemed "normal", and a follow-up MRI conducted months later showed no signs of "acute fracture." (Ex. 6 OAH-0047-0048); (Ex. 9, Basha Open MRI Records, BD-002). While it's true, as Garcia points out, that an August 2014 MRI revealed a "minor disc bulge" in his spine, there is nothing in the record establishing a nexus between this condition and the underlying accident. In fact, the only expert opinion on record is that of Dr. Ryan, who, on two separate occasions concluded that there were "no objective findings . . of an injury that would be related to the

motor vehicle accident . . . ." (Ex. 12 at 4). While not dispositive of the issue, Garcia has failed to present any "admissible evidence that his current condition resulted from the incident at issue." *Chandanais v. Wilson*, No. 300933, 2011 WL 5604649, at *2 (Mich. Ct. App. Nov. 17, 2011). And this is critical; "[t]he fact that the objective records do not rule out the accident as a cause of [Garcia's] injuries does not . . . help [Garcia] establish [his] burden of showing that the injuries were caused by the accident." *Sartor v. State Farm*, No. 11-14173, 2013 WL 3224039, at *6 (E.D. Mich. June 25, 2013); see also *Lenk v. Frankenmuth Ins. Co.,* No. 317014, 2014 WL 6713475, at *2 (Mich. Ct. App. Nov. 25, 2014) ("While a 2013 MRI revealed a 'right paracentral disc herniation . . . Lenk presented no evidence linking this new finding with her 2010 automobile accident. Thus, no genuine issue of material fact stands in the way of deciding as a matter of law whether Lenk has established an injury satisfying the tort liability threshold . . . ."). Similarly here, without any countervailing evidence establishing a causal relationship between Garcia's injuries and the accident, there is nothing for the finder of fact to consider.[4]

Nor is the Court convinced that Garcia has created a question of material fact surrounding the effect of his ability to lead a normal life after the accident. As the Michigan Supreme Court explained in *McCormick*, a plaintiff must show that an accident-related injury had "an influence on some of the person's capacity to live in his or her normal manner of living." 795 N.W.2d at 530. This inquiry "necessarily requires a comparison of the plaintiff's life before and after the incident." *Id.* The *McCormick* Court noted three caveats: "(1) the plaintiff's general ability to lead his pre-accident normal life need only be

---

[4] This analysis applies with equal force to Garcia's tinnitus symptoms, which pre-dated the accident in any event. *See* (Ex. 10, HFH-0072-0073).

affected, not destroyed, (2) the focus is on whether the impairment affected the plaintiff's ability to maintain his normal manner of living, not whether some of his manner of living has itself been affected, and (3) the impairment need not be permanent." *Mehdi*, 2015 WL 1227710 at *3.

Prior to the accident, Garcia maintains that he was "a typical active husband and father of active children", self-employed "working full time as a flooring installer", and spending "time grilling and socializing with his family." (Plf.'s Resp. 11). The collision allegedly "changed everything." *Id.* More specifically, Garcia argues that he was forced to stop working, "had to give up his family job of cooking and grilling", could no longer "do regular household chores like take out the garage", and "had to give up many driving duties to his wife . . . ." *Id.* at 11-12. But the record belies the bulk of these assertions. Indeed, the Court need not look beyond Garcia's own Facebook posts to arrive at this conclusion. On January 31, 2015, Garcia admitted that "life is good", he was "working 100 percent running his own crew." (Ex. 1, 184:7-23). Other posts, acknowledged by Garcia at his deposition, show him participating in a family cookout, riding a train, visiting a water park, riding a four-wheeler, and taking a six-week cross-county road trip during which he and his wife did all the driving. (Ex. 15, Facebook posts). Garcia further testified that his daily life typically includes driving his children to school, socializing with friends, grilling for his family, shopping for groceries and, according to his former supervisor, working as a flooring installer on a part-time basis. *See* (Ex. 1, 11-12, 18-19); (Ex. 5, 38:20-24). The fact that Garcia claims he cannot engage in shoveling snow or playing sports is immaterial absent a showing that these activities were significant to his life prior to the accident. *Andzelik v. Auto Club Ins. Ass'n*, No. 324281, 2016 WL 555854, at *3 (Mich. Ct. App. Feb. 11, 2016)

("There was no evidence that plaintiff participated in the group recreational activities she mentioned, other than fishing, with frequency.") In sum, Garcia's argument that his "ability to lead a normal life was affected by the accident is contradicted by the overwhelming evidence in the record." *Skipper v. United States*, 14-14281, 2016 WL 827376, at *7 (E.D. Mich. March 3, 2016).

For all of those reasons, the Court finds that Garcia has failed to raise a genuine issue of material fact sufficient to survive summary judgment.

## IV. CONCLUSION

Accordingly, the Court hereby GRANTS the Government's motion for summary judgment. (Dkt. 23). This order closes the case in its entirety.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: September 15, 2016

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 15, 2016, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager